IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: a search of the following devices:<br><br>A Blue Motorola XT2052 Verizon phone<br><br>A Black Apple iPhone in a black case<br><br>A Black Apple iPhone in a pink "Cellhelmet" phone case | Case No. **21-00224MB** |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Chad Lakosky, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described below.

a.      The purpose of this application is to seize evidence from a blue Motorola XT2052 Verizon phone, a black Apple iPhone in a black case, and a black Apple iPhone in a pink "Cellhelmet" phone case (collectively referred to as the **Target Devices**), currently located in the custody of Homeland Security Investigations in Sells, Arizona, seized from Adrian DURAN and Kaitlan JACOBS on May 4, 2021.  Probable cause exists to believe that evidence exists on these devices to show of violations of 8 U.S.C. § 1324(a)(1)(A)(v)(I), conspiracy to commit alien smuggling, 8 U.S.C. §

21-00224MB

1324(a)(1)(A)(ii), transporting illegal aliens, and 8 U.S.C. § 1324(a)(1)(A)(v)(II), aiding or abetting the crime of alien smuggling.

2.     I, Special Agent Chad Lakosky (your affiant), am an "investigative or law enforcement officer" within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations and to make arrests for offenses enumerated in section 1705 of title 50, United States Code. I am a Special Agent with the United States Department of Homeland Security Investigations (HSI). I have been so employed since March of 2018. I am a graduate of the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia, where I received training in, among other things, criminal investigative techniques, and investigations of violations of United States Codes, to include investigations of Titles 8, 18, 19, 21, and 31.

3.     Prior to my employment with HSI, I was employed by the Pinal County Sheriff's Office in the State of Arizona for 10 years from April of 2008-March of 2018 as a Deputy Sheriff. During that time, I investigated violations of state criminal and civil laws, conducted interviews, conducted covert surveillance, collected evidence, and made arrests for violations of criminal state laws. I was also assigned as a detective to the United States Marshal's Service Violent Offender Task Force, in which my duties included investigations into the whereabouts of state, local, and federal fugitives.   During that assignment, I received training in conducting criminal investigations, covert surveillance, and evidence collection. Prior to that, I was employed as a police officer in the Town of Marana, Arizona from January of 2006-April of 2008, where I had similar duties as my employment as a Deputy Sheriff. I am also a graduate of the Central Arizona Regional Law Officer's Training Academy (CARLOTA), where I received training in, among other things, criminal investigative techniques, and investigations of violations of criminal and state statutes.

21-00224MB

4.      During my law enforcement career, I have received formal training, as well as on-the-job training, relative to the investigation and interdiction of human smuggling and human trafficking. I have become knowledgeable regarding the trafficking methods employed by alien smugglers to conceal, transport, resupply, and harbor aliens present in the United States without admission or parole.

5.      Throughout his career, your affiant has performed various tasks which include, but are not limited to: (a) functioning as a case agent, which entails the management of investigations in several investigative program areas to include human and drug smuggling, financial crimes, immigration violations, and crimes involving child exploitation; (b) performing physical surveillance and thereby observing and recording movements of persons suspected of various criminal activities; (c) interviewing witnesses, cooperating individuals and informants; (d) written affidavits in support of federal search and seizure warrants; and (e) testified before federal Grand Juries.

6.      Furthermore, based on your affiant's background, training, and experience, your affiant knows that individuals involved in human smuggling often use cellular telephones to do the following:

    a.      Use cellular telephones to arrange, coordinate, and monitor criminal activities including communicating between foot guides, smugglers, facilitators, and other transporters/drivers. They also use cellular telephones to communicate with these same individuals during counter surveillance activities, to warn other co-conspirators of the presence of law enforcement or other obstacles to their criminal plans.

    b.      Use all the communication technologies available within the particular cellular telephone, including voice messaging, texting, audio communication, direct dial, push-to-

21-00224MB

talk, emailing, internet access, speed dial, photo and video images, and contact lists containing contact information for their criminal associates to accomplish their criminal activities.

c.     Use multiple cellular telephones and often change cellular telephones to avoid detection by law enforcement.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

7.     The property to be searched consists of the following:

A blue Motorola XT2052 Verizon phone, a black Apple iPhone in a black case, and a black Apple iPhone in a pink "Cellhelmet" phone case ("**Target Devices**").

The **Target Devices** are currently located in the custody of Homeland Security Investigations in Sells, Arizona, seized from Adrian DURAN and Kaitlan JACOBS on May 4, 2021.

8.     The applied-for warrant would authorize the forensic examination of the devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## SOURCES OF INFORMATION

9.     Your affiant is familiar with the circumstances described below, both through his personal participation in this investigation and by the discussions your affiant has had with other law enforcement officers who have knowledge of this case.  This affidavit is being submitted for the limited purpose of securing a search warrant; therefore, your affiant has not included every fact known to him or other law enforcement officers concerning this investigation.  Your affiant has set forth below only the facts that your affiant believes are necessary to establish probable cause for the issuance of a search warrant.

21-00224MB

## **PROBABLE CAUSE**

### **Historical Background – May 30, 2019 Event**

10.     On May 30, 2019, Homeland Security Investigations (HSI) Special Agents assigned to the Assistant Special Agent in Charge (ASAC) Sells office in Sells, AZ, District of Arizona in the United States Federal Court, responded to the United States Border Patrol Station in Tucson, Arizona to assist United States Border Patrol Agents (USBPAs) with an investigation into an alien smuggling event that occurred near Sasabe, Arizona, an area known for high volumes of alien and narcotics smuggling.   USBPAs had encountered Jesus Javier HERNANDEZ-Armenta driving northbound on State Route (SR) 286 as he was driving a blue Ford Explorer SUV.   USBPAs observed numerous indicators that the vehicle was potentially involved in smuggling activities, and when USBPAs got behind the vehicle at milepost 13 on SR286, the vehicle began to accelerate in an attempt to elude agents, who then activated their emergency lights to conduct a vehicle stop. The vehicle continued to flee at approximately 80 MPH (above the posted speed limit) to milepost 21, where the vehicle came to a stop and the driver, HERNANDEZ-Armenta, fled from the vehicle and was apprehended by USBPAs after a brief foot pursuit.   10 illegal aliens were located inside of the blue Ford Explorer driven by HERNANDEZ-Armenta, who was also determined to be an illegal alien present in the United States without permission from the government of the United States.   During a post Miranda advisement custodial interview, HERNANDEZ-Armenta admitted to being the driver of the vehicle transporting the aliens.   HERNANDEZ-Armenta stated that one of two cell phones located on his person during his arrest was not his phone, and claimed that the Motorola cellular phone was in the vehicle when he got into the vehicle to drive the other 10 illegal aliens further into the United States, and abandoned ownership of the Motorola cellular phone.

21-00224MB

11.     On June 6, 2019, United States Magistrate Judge Eric Markovich, of the District of Arizona, signed application, order, and affidavit 19-04480MB authorizing the search of the black Motorola cellular telephone seized from HERNANDEZ-Armenta, on May 30, 2019.  SA Michael Saclarides conducted a manual search of the device on June 12, 2019.  During the search, the phone was identified to have a host number of (520) 429-2573 and to only have two non-factory contacts saved in the contacts list: Aa (520) 833-7375 and J (520) 306-7730.  The call log listed a missed call at 3:16 PM on May 30, 2019 with Aa, a 19 second call with J at 4:53 PM, and missed calls with J at 5:59 PM and 6:57 PM.  The Google Maps history revealed recent searches for El Mirador Road in Sasabe, Arizona and Poso Nuevo Ranch Road in Tucson, Arizona.  The WhatsApp account was found to be linked to the email address: JohnGoat1990@gmail.com. Further analysis identified two contacts saved in the WhatsApp application, "Aa" and "J". The telephone numbers for these contacts are the same as the telephone numbers saved in the Motorola phone's contacts. The following contacts were all via the WhatsApp application: On May 30, 2019, at approximately 4:44 PM, Aa sent a map with a pin drop to the device. The pin drop was to 31.7839910, -111.4136210, which is located on or near Poso Nuevo Ranch Road in Tucson, Arizona. The same pin drop was sent again at 5:02 PM and there was a missed voice call at 6:50 PM.  Also, on May 30, 2019, the device received a pin drop from J at 4:48 PM. This pin drop was identical to the pin drops received from Aa. There were also missed voice calls from J at 4:59 PM, 5:00 PM, 5:02 PM. Then text messages from J at 5:07 PM, two at 5:16 PM, and at 5:17 PM. The messages were in Spanish and the following is a translated summary of the exchange:  J: Just follow this location. Send me (your) location. Or what mile marker you are at??  Then there were three more missed voice calls from J at 5:26 PM, 5:31 PM, and 5:32 PM.  SA Saclarides determined that the communications and pin drops in the above conversations were sent and received before, during,

21-00224MB

and immediately following the alien smuggling event on May 30, 2019.

### Historical Background – June 7, 2019 Event

12.     On June 7, 2019, subject Bruce RIVERA was stopped by USBPAs and officers of the Tohono O'odham Police Department driving a rental car signed for by him on Federal Route (FR) 19 near milepost 6 near San Miguel, Arizona, another area known to agents to have a high volume of human and narcotic smuggling activity.  RIVERA was questioned by USBPAs and admitted to being in the area to pick up a load of illegal aliens. RIVERA explained to the USBPAs that he was sent a pin drop, via WhatsApp, with the location of the aliens. RIVERA consented to a search of his phone and showed the BPAs contacts saved as "AA" and "Mr. Clean" which RIVERA identified as the coordinators of this smuggling activity. The pin drop with the location of the aliens was sent by telephone number (702) 800-0924, which was not a saved contact in RIVERA's phone.  Telephone number (520) 268-5535 was saved in RIVERA's phone as Mr. Clean and (520) 833-7375 was saved as AA. (520) 833-7375 is known to be used by DURAN per U-Haul rental records received via subpoena, and his numbers are often saved in other smugglers' telephones as A or AA. DURAN is also known as Mr. Clean based on previous text message data identified by agents. The number (520) 833-7375 was also saved as AA in a phone seized from the driver of the alien smuggling load vehicle on May 30, 2019 and was one of only two contacts saved in the phone.  USBPAs eventually located two illegal aliens in the area where RIVERA was sent via pin drop to pick up the aliens.

### Historical Background – July 23, 2019 Event

13.     On July 23, 2019, associates of Adrian DURAN were apprehended by USBPAs near milepost 12 on SR 286 near Sasabe, Arizona.  Kaitlan JACOBS (girlfriend of DURAN), Adon COX (father of JACOBS), and Arturo CORDOVA were stopped in a white Ford F-150 registered

21-00224MB

to Juan Julian DURAN, relative of Adrian DURAN, to an address of 12150 W. Trigger Lane in Tucson, Arizona. This F-150 was traveling in tandem with a black SUV bearing Arizona license plate BNK9063, which had been observed by USBPAs prior to this event parked at the 12150 W. Trigger Lane address. USBPAs were traveling behind the black SUV as it approached an immigration checkpoint at milepost 26 on SR 286 when the vehicle suddenly turned off of the road and began driving off road through the desert and hitting a barbed wire fence before becoming immobilized. Seven illegal aliens, to include the driver, a juvenile alien with no status in the United States, were quickly apprehended by USBPAs as they attempted to flee from the vehicle. The illegal alien passengers indicated that the juvenile was not part of their group but instead someone who met them after they had crossed into the United States. During a subsequent search of the black SUV that was transporting the aliens by USBPAs, they located a Motorola cell phone that JACOBS, CORDOVA, COX, and the occupants of the SUV all denied ownership of, and the phone was identified as abandoned property. During a search of that cell phone, SA Michael Saclarides identified communications that appeared to indicate that the device was possibly used in the July 23, 2019 alien smuggling event and possibly belonged to JACOBS.

14.    On July 24, 2019, SA Chad Lakosky and SA Michael Saclarides conducted a search of the abandoned device. In summary, agents located WhatsApp conversations between the abandoned device and phone number 520-268-5669, identified as belonging to Adrian DURAN in U-Haul rental records received via subpoena. The conversation consisted of Adrian DURAN telling the user of the abandoned device that he had sent a pin drop for El Mirador Road (near Sasabe, Arizona) to travel to, as well as a pin drop on Poso Nuevo Road in Sasabe, in what appeared to be an attempt to give directions to the user of the abandoned phone to navigate around the Sasabe, Arizona area. There was also a message string in the phone that contained messages indicating

8

that the user of the device was communicating their location at mileposts along SR286, and possibly identifying that a USBPA vehicle was near them but had stayed away from them prior to the SUV attempting to flee from agents.

15.    An additional Motorola cell phone located in the white F-150 during the July 23, 2019 smuggling event was abandoned by JACOBS, COX, and CORDOVA, who all denied ownership of the device located in their vehicle when they were stopped by USBPAs.  Subsequent search of that device indicated that it was potentially utilized in the May 30, 2019 alien smuggling event and indicated that the device potentially belonged to JACOBS.  On August 1, 2019, SA Saclarides applied for and received a federal search warrant for the abandoned Motorola phone. The Honorable Lynnette Kimmins, United States Magistrate Judge for the District of Arizona, authorized the search warrant, under 19-06330MB.  During subsequent search of the device, additional WhatsApp voice and text messages were observed between JACOBS and Adrian DURAN, detailing the events that occurred prior to and during the smuggling event up to the point that both vehicles were stopped by USBPAs. An additional cell phone seized from JACOBS and searched pursuant to the above listed search warrant revealed additional images and conversations located in the device included an image showing a permit obtained from Pima County for electrical/mechanical work to be done at 12150 W. Trigger Lane issued to Adrian DURAN, pictures and videos of Adrian DURAN and JACOBS at the 12150 W. Trigger Lane property, a video of them being in what appeared to be the white Ford F-150 seized by USBPAs in the July 23, 2019 event, other screenshots and accounts listed to "Adrian DURAN" to include a device utilized in alien smuggling activities.

## Historical Background – Death of ████████████

16.    On September 8, 2019, detectives with the Pima County Sheriff's Department working a

9

21-00224MB

case of a missing juvenile in the Three Points, Arizona area possibly linked to Adrian DURAN were notified that the bodily remains of the juvenile, ███████████, had been located in the desert area near south of Three Points, Arizona in an area known to be utilized by Adrian DURAN and associates to smuggle aliens into the United States from Mexico. On September 8, 2019, and September 22, 2019, detectives came into possession of two cellular phones believed to have been utilized by ███████████ that were located on his person and in the area of where his remains were located. After reviewing the data from both devices, SA Chad Lakosky and SA Michael Saclarides determined that the devices were in ███████████ possession, he had communicated with Adrian DURAN and other smuggling associates on May 29, 2019 and May 30, 2019, he had been picked up by Adrian DURAN and transported by associates out to the area near El Mirador Road in Sasabe, Arizona near where Jesus HERNANDEZ-Armenta and JACOBS had picked up the group of illegal aliens that were apprehended by USBPAs to serve as a foot guide for illegal aliens that had just crossed into the United States. In one of the WhatsApp conversations around the time that JACOBS and HERNANDEZ-Armenta were stopped by USBPAs, ███████████ had conversations with Adrian DURAN stating that he and the people he was with needed help, said they were scattered everywhere and were severely dehydrated with nothing to drink. GPS pin drops were sent by ███████████ to Adrian DURAN to show where he was at and he asked to be picked up. Adrian DURAN told ███████████ that he would have to get to the "28", believed by agents to indicate milepost 28 on SR 286 which is north of the immigration checkpoint, in order for Adrian DURAN to send someone to help him. Eventually, communications with ███████████ ceased and he was not seen or heard from until his remains were discovered months later. When contacted by PCSD detectives via telephone, Adrian DURAN claimed that he had not seen or heard from ███████████ in an extended period of

21-00224MB

time that encompassed the timeframe that he had spoken with, been with, and coordinated with him for the May 30, 2019 smuggling event.

**Historical Background – Means and Methods of the Duran Alien Smuggling Organization**

17.    Through a nearly two-year investigation of Adrian DURAN and his alien smuggling organization, your Affiant has been able to determine certain means and methods to DURAN's alien smuggling activities, as follows:

a.   Use of Cellular Phones: DURAN makes extensive use of cellular phones and the WhatsApp communication platform.  For example, in the July 23, 2019 event described above, agents seized five phones from JACOBS's vehicle (including one phone from Cox, one from Cordova, two from JACOBS, and one unclaimed phone) and an additional phone from the load vehicle driven by the juvenile.  As noted previously, ████████████ used two cellular phones prior to his death.  Additionally, through the investigation, agents have noticed that DURAN frequently utilizes several phones and numbers.  DURAN's associates have utilized a wide variety of phones, including Motorolas, Apple iPhones, and LG Cricket phones.

b.   Ownership: DURAN has few assets registered in his name.  His primary residence, a trailer located at 12150 W. Trigger Lane, Tucson, Arizona (near Three Points), is registered in his nephew's name.  DURAN's driver's license shows that he resides at his mother's address in Tucson.  However, DURAN has confronted agents about observing him on his property (referring to the Trigger Lane location).  Phones seized in this investigation are never registered to DURAN personally, even if he may have used them.  DURAN similarly makes frequent use of third parties to rent or register vehicles that his organization utilizes.  For example, Bruce Rivera, in the event described above on June 7,

2019, utilized a rental vehicle in his attempt to pick up illegal aliens. Rivera previously rented a vehicle that DURAN and JACOBS were using on May 30, 2019. The White Ford F-150 referenced in the July 23, 2019 event is registered to DURAN's nephew. Other vehicles associated with the investigation have been registered to relatives of DURAN and his associates.

c.  Use of juveniles:  DURAN has utilized juveniles at least twice prior during the investigation. As referenced above, ███████████ was an on-the-ground coordinator/foot guide for DURAN.  Additionally, DURAN utilized a juvenile to pick up the load of aliens during the July 23, 2019 event.

### March 15, 2021 Event

18.    On March 15, 2021, Deputy Travis Williams with the Pinal County Sheriff's Office conducted a traffic stop on a Dodge Durango SUV registered to Kaitlan JACOBS at 12150 W. Trigger Lane in Tucson, Arizona on eastbound Interstate 10 at milepost 217 near Eloy, Arizona. The vehicle was stopped for violation of traffic laws, specifically following too closely for the conditions.  Adrian DURAN was the driver of the vehicle, and the front seat passenger was identified as 17-year-old juvenile male subject, Anthony Lopez-Jimenez.  DURAN stated that the vehicle was registered to his girlfriend (JACOBS). Deputy Williams observed a black grocery bag sitting on the front right passenger floorboard between Jimenez's feet and could smell the odor of raw marijuana emitting from the vehicle.  During the stop, Adrian DURAN identified Jimenez as his nephew.  DURAN told Deputy Williams that he lived in Tucson, Arizona, and was traveling home from Phoenix, Arizona where he was evaluating a concrete job for his uncle.  DURAN could not provide an address for his uncle after claiming that he went to his uncle's house.  Deputy Williams then spoke with Jimenez, who identified DURAN as his uncle.  Jimenez told Deputy

Williams that he and DURAN were going to Phoenix, Arizona to buy ammunition at a Cabela's store, but realized that the store was closed and turned around to go home to Tucson.  (It should be noted that DURAN is a prohibited possessor of firearms due to felony convictions, and Jimenez is a minor under 18 years old, making him unable to purchase ammunition under Arizona law without written permission from his parent or guardian.)  Additionally, Deputy Williams noted that the traffic stop was conducted at 8:43 PM and in his personal experience in previous visits to Cabela's that the store is open until 9:00 PM on weekdays. Where Deputy Williams stopped DURAN and Jimenez was approximately an hour and 20 minutes away from Cabela's. Deputy Williams noted that if the true purpose of the trip was to visit Cabela's that DURAN and Jimenez would have had approximately 2 hours of shopping time before the store closed. Jimenez did not mention visiting DURAN's uncle.  The stories given to Deputy Williams by DURAN and Jimenez, commonly referred to as "cover stories" are used to convince law enforcement that the encounter is normal.

19.    Adrian DURAN gave verbal and written consent to Deputy Williams to search the vehicle. Both subjects denied the presence of any illegal narcotics, weapons, or large amounts of US currency inside of the vehicle.  Deputy Williams discovered a newly purchased tarp and two camouflage colored backpacks containing camouflage clothing, dry food supplies, toilet paper, and handheld radios in the back of the vehicle that were consistent with the type used in alien and narcotic smuggling and were also identifiable as indicators of human smuggling activity by Deputy Williams.  Deputy Williams also discovered $20,000 USD hidden underneath the front passenger seat in the black grocery bag where Jimenez had been sitting that neither Adrian DURAN nor Jimenez had stated was there when questioned prior to the search.  When asked about the origin of the currency, DURAN denied any knowledge of the currency, and Jimenez said that the money

was his.   Jimenez said that he was saving to buy a boat and that he liked to keep the money with

him in case he found a good deal on a boat.   Jimenez stated that he had forgotten about the currency

and claimed that it was $10,000 (as opposed to the $20,000 that had been located).   Jimenez said

that that his grandmother had given him the money over a period of time and also claimed that he

had worked periodically with DURAN at his job washing cars to earn money. Deputy Williams

observed that the $20,000 was wrapped in two bundles and saw that one bundle had a bank band

with "Wells Fargo" written on the band (see the photos below).   Deputy Williams asked Jimenez

from which bank he had withdrawn the currency. Jimenez replied that the money was never

withdrawn from a bank.   Jimenez was in possession of a cellular phone and gave Deputy Williams

the password for the device.   The currency and the cellular phone were seized by deputies.




20.     Queries to the Arizona Department of Economic Security by SA Lakosky revealed that

between June of 2018 through March of 2020, Adrian DURAN had received approximately $9,079

from reported employment income at "Mister Car Wash" and "Premier Roofing Waterproofing".

The reported employment income earned by Adrian DURAN over the nearly two-year period was

shown to be less than half of what was seized by deputies on the traffic stop.

21.     Based on the encounter described above as well as my knowledge of the investigation, I

believe that DURAN and Jimenez were traveling from a location north of Picacho, Arizona where

they had recently received payment for DURAN's alien smuggling activities. The equipment (tarp,

backpacks, radios, toilet paper, etc.) and camouflage clothing in the vehicle are indicative that DURAN continues to actively engage in alien smuggling.  Jimenez's presence with DURAN is not unusual, either.  DURAN regularly utilizes family members and friends to assist him in his alien smuggling activities, and this is consistent with many alien smuggling and drug trafficking organizations.  Due to the illegality of the activity, alien smugglers will often utilize family members and close friends based on the bonds of trust.  DURAN has shown no hesitance to use juveniles to assist him.

22.     On April 1, 2021, HSI Special Agent (SA) Chad Lakosky applied for a search warrant to search the cellular device that was seized from Anthony Jimenez Lopez by the Pinal County Sheriff's Office on March 15th, 2021.  Search warrant #21-01492MB was granted by the Honorable Bruce Macdonald, United States Magistrate Judge in the United States District Court for the District of Arizona.

23.     On April 2, 2021, SA Lakosky met with Sergeant Brian Messing of the Pinal County Sheriff's Office in Florence, Arizona where the device was being held.  The device was pulled from the custody of the evidence custodian and given to Sergeant Messing, who gave it to SA Lakosky.  SA Lakosky executed the search warrant conducted an extraction of the data on the device using cell phone extraction software at approximately 1:36 PM. SA Lakosky reviewed the phone extraction data and observed the following summary of information:

   a.  **Message conversations**:

      (1) 520-248-5509 "Tio R"- On 01/01/2021, Jimenez has a conversation with "Tio R" at approximately 1:24 AM.  In the conversation, Jimenez sent a video (FullSizeRender.MOV) of what appears to be Jimenez (based on haircut) covered by a smiling "emoji" face shooting an AK-47 style rifle in the desert.  "Tio R' asked "is that

Adrians" and said, "that think [elieved misspelling for 'thing'] is nice". Jimenez replied, "His girl gun" and "Yeah it's nice". "Tio R" replied "Twll [believed misspelling for 'tell'] him to tell it to me". Jimenez replied that he would "tell him", then said "she" (believed to be JACOBS) probably would sell it to him then asked if they'd have to do paperwork to which "Tio R" replied "Just a bill of sale.".(DURAN is a convicted felon and prohibited from possessing firearms)

(2) *Note that the raw video in the above conversation without emoji face was located under the device under cplATBpX6xVe0E+SZAl+322sucXcAY.mov, where Jimenez was identified as the shooter of the rifle, as well as another video of him shooting the rifle

b. **Videos:**

(1) cplAfHgRXmhVhff6TcTIAFy1iilhQqs.mp4: a video of what appears to be DURAN (based off voice narrating in the video) in possession of multiple large baggies of marijuana more than what personal use laws would allow in Arizona, as well as an open wallet with partial view of an unidentifiable Arizona ID card and a medical ACCHS card and $20 USD laid on the table.

(2) cplASMnKluwOBqhVjVDireBYIRSI6lv.mp4: marijuana and THC wax on a kitchen counter.

(3) cplAXYI8QH1jUdu+HkDeW1Fsokan7pc.mov: video of Jimenez shooting AK47 rifle in desert, rifle may be capable of fully automatic fire based on multiple rounds being fired in very quick succession at certain points.

c. **Images:**

(1) DCIM/100APPLE/IMG_0139.JPG: Jimenez in camouflage clothing.

(2) DCIM/100APPLE/IMG_00307.JPG: DURAN in camouflage clothing on a roadway.

(3) DCIM/100APPLE/IMG_0311.JPG: Jimenez in camouflage shirt walking across roadway near sign indicating "Pena Blanca Lake"

(4) DCIM/100APPLE/IMG_0302.JPG: photograph of US currency wrapped in a tan/white bank wrap stating "$10,000", words digitally added at the bottom of the photo stating "The grind don't stop".

(5) DCIM/100APPLE/IMG_0011.JPG: a photo of an AR15 rifle, a black handgun and ammunition laid out on a tan/black blanket spelling out "MAX JR" with a heart next to it.

(6) DCIM/100APPLE/IMG_0172.JPG: Hispanic male appearing to be Jimenez with a laughing/crying "emoji" icon over majority of his face as he carries 8-9-gallon size Ziploc bags of marijuana and holding a handgun pointed at the camera

(7) DCIM/100APPLE/IMG_0160.JPG: Jimenez in camouflage hoodie standing in the doorway of what appears to be DURAN's trailer at 12150 W Trigger Lane in Tucson, Arizona.

(8) DCIM/100APPLE/IMG_0062.JPG: Screenshot "lawforkids.org" page explaining when "kids" (under the age of 18) can possess firearms in Arizona.

(9) DCIM/100APPLE/IMG_0249.JPG: Google maps screenshot showing location two houses east DURAN's residence of 12150 W Trigger Lane

(10)    DCIM/100APPLE/IMG_0081.JPG: Image of "trail camera" in the desert at night with a caption stating, "CARTEL SCOUTS CLEAR THE TRAIL BEFORE BRINGING UP THE GROUP", dated 08/17/2020.

(11)    DCIM/100APPLE/IMG_0236.JPG: A photo of DURAN taking a "selfie" of him

21-00224MB

standing in camouflage clothing in front of a blue Dodge Durango registered to JACOBS that he was stopped in by PCSO

(12)    DCIM/100APPLE/IMG_0236.JPG: A snapchat screenshot of a news article showing an adult female in the back seat of a law enforcement vehicle with the word "Arrested" across the screen, title of the article "Alleged human smuggler streams high-speed chase on Facebook live".

(13)    DCIM/100APPLE/IMG_0237.JPG: Screenshot of social media post depicting a tan Glock handgun frame and trigger with the caption "U niggas that still be at the wash are STUPID AF [as fuck], when yall gone listen to me to get tf away from there, FED'S [federal law enforcement] are stupid tapped in yall gone learn".

(14)    E302F9C9-025A-4CAA-9971-552174089494.JPG: Photo of a Glock 17 handgun with an extended magazine.

(15)    49707f91-5115-423E-8B70-CC492498797D.MOV/5005.JPG: Image of what appears to be three suspected smuggled persons in tattered camouflage clothing sitting in by rocks.

(16)    C6328143-304D-45DF-9CD6-CF6F464EAF02.MOV/5005.JPG:     Image    of suspected smuggled persons in camouflage clothing carrying backpacks through the desert.

(17)    D1DB7EDA-A3F8-4E4A-A997-A150C1F95C9F.MP4/5050.JPG: Image of a black/wood handled Smith and Wesson Revolver.

(18)    *Numerous images showed DURAN and Jimenez in camouflage clothing in the desert area near Arivaca, Arizona

d.  **Locations:**

(1) 16 locations were obtained from the device, three of which showed the device located at 12150 W Trigger Lane in January and February of 2021.

(2) Additional locations showed the device around the Tucson metropolitan area, as well as the last location showing the device located on Interstate 10 near Picacho Peak where this device and $20,000 was seized by the Pinal County Sheriff's Office.

24.     On April 12, 2021, SA Chad Lakosky sent subpoena number ISS Subpoena ICE-HSI-SS-2021-00773 to AT&T, Inc. requesting subscriber and call data information for phone numbers 520-409-2442 (DURAN) and 520-409-2449 (JACOBS). AT&T, Inc. provided the records on April 19, 2021, showing DURAN as the account holder and subscriber of 520-409-2442, and records showed communication between the phone numbers for DURAN and JACOBS. Call data records showed that the phone numbers appeared to be active as of April 12, 2021, the end date of requested data on the subpoena.

25.     On April 28, 2021, SA Chad Lakosky applied for a federal search warrant to obtain location data concerning cellular phone number 520-409-2442, identified as a phone number utilized by Adrian DURAN.  The search warrant (21-05728MB) was telephonically sworn and authorized by the Honorable Judge Lynette Kimmins, United States Magistrate Judge, United States District Court, District of Arizona.  SA Lakosky served the court order to the cellular service provider, AT&T, and received GPS location information regarding the phone number from April 28, 2021 until May 4, 2021, when DURAN was taken into custody at his residence of 12150 W. Trigger Lane in Tucson, Arizona on a federal arrest warrant regarding human smuggling charges pertaining to this investigation.  JACOBS was also taken into custody at the same time and location on a federal arrest warrant regarding the same investigation.

26.     On May 4, 2021, agents executed a federal search warrant (21-5724 MB) of a residence

located at 12150 W. Trigger Lane, Tucson, Arizona, as authorized by the Honorable Lynette Kimmins, United States Magistrate Court Judge, District of Arizona. During the search of the residence, the **Target Devices** were located by agents.   A black Apple iPhone with a pink "Cellhelmet" phone case was located on JACOBS' person while she was being taken into custody. A blue Motorola XT2052 Verizon phone and a black Apple iPhone in a black case were located on the nightstand next to the bed in a bedroom used by JACOBS and DURAN.   On the home screen of the Motorola XT2052 device, agents observed that there was an incoming message notification from a contact listed as "Ch" that stated, "I'm planning on spending as much money as I m..".   On the home screen of the black iPhone in the black case next to the Motorola device, agents observed a photograph of DURAN, JACOBS, their infant child, and another family member.   SA Lakosky dialed the phone number for DURAN's phone that agents were receiving GPS locations for pursuant to a federal court order, and the device rang as SA Lakosky called the number.   SA Lakosky placed all devices into airplane mode and observed that the Motorola XT2052 device had no password protection on the device.  SA Lakosky has come to know during his training and experience in human smuggling investigations that cellular devices without password protection are often used by human smugglers and smuggled humans to communicate and coordinate their movements and smuggling operations.   Additionally, SA Lakosky had identified numerous other Motorola cellular devices with and without password protection utilized by DURAN, JACOBS, and other smuggling associates during their smuggling operations that had been seized and searched by agents, providing further information showing the smuggling activities occurring with the use of the devices.

27.     There is probable cause that the **Target Devices** contain evidence of alien smuggling activities, in violation of Title 8 U.S.C. § 1324.  The location of the **Target Devices** at the time

they were seized and the evidence detailed above support probable cause that DURAN and JACOBS utilize the **Target Devices** personally and are both involved in similar illegal activities in some capacity.  Based on the investigation to date, DURAN's organization utilizes phones to coordinate their illegal activities.  Therefore, probable cause exists to believe that the **Target Devices** contains evidence of alien smuggling, as detailed above.

## TECHNICAL TERMS

28.     Based on your affiant's training and experience, the following technical terms are used to convey the following meanings:

   a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b.  Digital camera:  A digital camera is a camera that records pictures as digital picture

21-00224MB

files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.

These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending, and receiving e-mail, and participating in Internet social networks.

21-00224MB

g.  Pager:  A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

29.    Based on your affiant's training, experience, and research, your affiant knows that these devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.   In your affiant's training and experience, the nature of narcotics smuggling, almost universally necessitates frequent and immediate communication between co-conspirators and accomplices.   As such, examining data stored on devices of this type frequently uncover, among other things, evidence that reveals who possessed or used the device; the rank and scope of their participation in the smuggling organization; who their accomplices were; as well as revealing or validating particular details regarding the instant

criminal conduct.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

30.     Based on your affiant's knowledge, training, and experience, your affiant knows that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

31.     Nature of examination.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which your affiant is applying would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

32.     Manner of execution.  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise.  Consequently, your affiant submits there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

//

21-00224MB

## **CONCLUSION**

Your affiant submits that this affidavit supports probable cause for a search warrant authorizing the examination of the **Target Devices** described in Attachment A to seek the items described in Attachment B. Having signed this affidavit under oath, the affiant states that its contents are true and correct to the best of his knowledge, information, and belief.

CHAD L
LAKOSKY

Digitally signed by CHAD L
LAKOSKY
Date: 2021.05.13 09:58:37
-07'00'

Chad Lakosky, Special Agent
Homeland Security Investigations, Affiant

Subscribed and sworn to telephonically this __13th__ day of May, 2021.

Honorable Eric J. Markovich
United States Magistrate Judge

21-00224MB

# **ATTACHMENT A**

This warrant authorizes the forensic examination of the following devices for the purpose of identifying the electronically stored information described in Attachment B:

a.      a blue Motorola XT2052 Verizon phone,

b.      a black Apple iPhone in a black case,

c.      a black Apple iPhone in a pink "Cellhelmet" phone case

also referred to as the "**Target Devices**."  The **Target Devices** are currently being held in the custody of Homeland Security Investigations in Sells, Arizona,

21-00224MB

**ATTACHMENT B**
**DESCRIPTION OF ITEMS TO BE SEARCHED FOR**

1.      Data and/or digital files stored on or accessed through the **Target Devices** (as described in Attachment A) relating to alien smuggling, wherever it may be stored or found, specifically including:

           a.      lists of customers and related identifying information.

           b.      types, amounts, and prices of drugs trafficked, as well as dates, places, and amounts of specific transactions.

           c.      types, amounts of money obtained, received, exchanged, deposited, withdrawn, or delivered as well as dates, places, exchange rates, and amounts of specific transactions.

           d.      any information related to sources of money or narcotic drugs (including names, addresses, phone numbers, or any other identifying information).

           e.      all bank records, checks, credit card bills, account information, and other financial records.

2.      Electronic correspondence stored on or accessed through the Target Smartphone relating to alien smuggling, to include emails and attached files, text messages, and instant messaging logs.

3.      Information related to incoming calls, outgoing calls, missed calls, and duration of calls stored on or accessed through the Target Smartphone.

4.      Contact lists stored on or accessed through the Target Smartphone, to include telephone and email contact names, telephone numbers, addresses, and email addresses.

5.      Evidence of persons who used, owned, or controlled the Target Smartphone.

6.      Logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, instant messaging logs, photographs, electronic correspondence, and telephone contact lists stored on or accessed through the Target Smartphone.